**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

SABRA ABDU MOHAMMED,

Petitioner,

v.

CURTIS J. ALJETS, District Director,
Immigration and Naturalization Service,
and JOHN ASHCROFT,
U.S. Attorney General,

Respondents.

Civil No. 02-349 (JEL/AJB)

**REPORT AND RECOMMENDATION**

Petitioner commenced this action by filing an application for habeas corpus relief pursuant to 28 U.S.C. § 2241. (Docket No. 1.) He claims that he is being detained by the United States Immigration and Naturalization Service, (INS), in violation of his rights under federal law and the Constitution. Respondents deny Petitioner's claims, and seek to have the petition dismissed. The matter has been referred to this Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, the Court finds that Petitioner is not entitled to a writ of habeas corpus at this time. It will therefore be recommended that this action be DISMISSED.

## I. BACKGROUND

Petitioner was born in Ethiopia in 1965 -- although the exact place of his birth has been a matter of great confusion, (as discussed more fully below). Sometime in the early 1970s, Petitioner fled to Sudan to escape widespread violence and warfare in his homeland. In 1983, he came to the United States as a refugee, and in 1984 he became a lawful permanent resident alien.

FILED JAN 2 9 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

During the next sixteen years, Petitioner was arrested more than twenty times, for a variety of alleged offenses. His criminal record includes state court convictions for theft, forgery, and at least three assaults. Because of his extensive criminal activities, the INS took Petitioner into custody and began removal proceedings against him in 2000. After a series of hearings and appeals, a final warrant of removal was issued in May 2001. Since that time, the INS has been trying to remove Petitioner to Ethiopia. To date, however, the INS has been unable to complete the removal process, because Ethiopia has not yet agreed to take Petitioner back.

Respondents contend that Petitioner's removal would have been completed by now if he had cooperated with the INS. When an INS deportation officer asked Petitioner to fill out a travel document application in May of 2001, he refused. The deportation officer explained to Petitioner that his lack of cooperation would only delay the completion of his removal and extend his INS detention, but Petitioner still refused to fill out the application form. (Declaration of Benjamin T. Jorgenson dated February 28, 2002, [Docket No. 6], ¶ 4.) Petitioner initially denied Respondents' accusations about his lack of cooperation, claiming that he has consistently done everything he could to expedite his removal. (Petitioner's memorandum dated May 28, 2002, [Docket No. 15], pp. 10-16.) More recently, however, Petitioner has admitted that he did not cooperate with the INS, because (he now claims) he was "confused." (Record of Sworn Statement In An Administrative Proceeding, attached to the Declaration of Jennifer Hartnett, [Docket No. 27].)

During the fifteen months following Petitioner's refusal to complete the travel document application, the INS tried on its own to obtain the necessary travel documentation from Ethiopian officials. Even though the INS made frequent inquiries during that period,

the Ethiopian officials apparently provided very little by way of response or assistance. (Jorgenson Declaration, supra, ¶s 5-7; Certified INS Record, [Docket No. 9], Exh. M, p. 88; Declaration of Bruce A. Norum, dated September 11, 2002, [Docket No. 20], ¶s 3-4.) Finally, in September 2002, an INS agent received a call from an Ethiopian official who indicated that Petitioner might not be removable to Ethiopia at all, because it appeared he might not be a citizen of Ethiopia. (Id. at ¶ 5.) The INS was informed that Petitioner apparently had been born in a city called Asmara, which had been part of Ethiopia at the time of Petitioner's birth, but which is now part of the separate and independent nation of Eritrea.

Thus, as of September 2002, the INS faced a new concern: should Petitioner be removed to Ethiopia, or should he be removed to Eritrea? The answer to this question depends on where Petitioner was born. If he was indeed born in Asmara, then he presumably must be removed to Eritrea; but if he was born in a place that is still part of Ethiopia, then he presumably is still a citizen of Ethiopia, and he must be removed to that country.

Unfortunately, the seemingly simple question of where Petitioner was born has not been easy to answer. The record is replete with conflicting information on that issue. When Petitioner came to this country in 1983, he completed a registration form that showed he was born in Addis Ababa, which is still part of Ethiopia. (Certified INS Record, [Docket No. 9], Exh. F, p. 50.) A year later, however, when Petitioner applied for permanent resident alien status, he indicated that he had been born in Asmara, which is now part of Eritrea. (Id., Exh. A, p. 1; Exh. F, p. 52.) More significantly, in a letter dated March 20, 2002, addressed to "The Ethiopian Ambassador," Petitioner expressly stated – "I was born

in Asmara City on 1/1/65." (Attachment to letter dated March 25, 2002; [Docket No. 12].) A few months later, however, Petitioner filed a "Declaration" in this case that says something much different, namely that "I Sabra A. Mohammed, submit this document today to this honorable Court to verify that my place of birth is Addis Ababa, Ethiopia, and not Asmara, Eritrea." (Petitioner's undated declaration filed October 7, 2002; [Docket No. 22].) During an INS interview conducted in November of 2002, Petitioner reasserted that he was born in Addis Ababa. (Record of Sworn Statement In An Administrative Proceeding, attached to the Declaration of Jennifer Hartnett, [Docket No. 27].) That seems to be Petitioner's current position on the birthplace issue.

When Ethiopian officials first suggested that Petitioner appeared to be Eritrean, rather than Ethiopian, the INS changed its removal plans for Petitioner. Instead of trying to remove him to Ethiopia, the INS started trying to remove him to Eritrea. (Declaration of Bruce A. Norum dated September 11, 2002, [Docket No. 20], ¶ 6.) More recently, however, Petitioner apparently has convinced the INS that he really was born in Addis Ababa, and that he should be removed to Ethiopia – not Eritrea. (Declaration of Jennifer Hartnett dated November 26, 2002, [Docket No. 27].) Evidently, the Ethiopian Embassy still doubts that Petitioner actually was born in Addis Ababa. (Id., ¶ 4.) As far as the Court can tell, however, the INS is currently trying, once again, to remove Petitioner to Ethiopia rather than Eritrea.

Respondents' latest communication to the Court offers no clue as to just when they think the INS might actually complete the removal process. The most recent submission of record is a declaration by Deportation Officer Jennifer Hartnett, dated November 26, 2002, (Docket No. 27), which states only that "[i]t is my understanding at this time, that

there is still the possibility of the Ethiopian Embassy issuing Mr. Mohammed a travel document." (Id., 7.)

Petitioner has been detained by the INS at all times since July 2000. When he commenced this action, he was being held at the Minnesota Correctional Facility in Rush City, Minnesota. Shortly thereafter, the INS transferred Petitioner to a penal facility in Oklahoma, where he is still being held.[1]

The INS has periodically reviewed Petitioner's situation to determine whether he should be granted supervised release from custody while the INS continues its efforts to remove him. To date, however, the INS has not seen fit to grant such a release. The most recent assessment of Petitioner's eligibility for supervised release was completed on October 16, 2002. On that date, the INS issued a written "Decision To Continue Detention," which informed Petitioner that "your custody status has been reviewed and it has been determined that you will not be released from the custody [of the INS]... at this time." That decision further indicates that "[t]he INS will not consider your release until you taken [sic] the steps necessary to establish your citizenship with one [of] these countries" -- i.e., either Ethiopia or Eritrea. (Attachment to Respondents' supplemental submission dated November 14, 2002, [Docket No. 24].)

Thus, as of now, the INS has been attempting to remove Petitioner from this country for approximately 20 months. Petitioner has been detained during that entire time, and

---

[1] Petitioner's current habeas corpus petition can still be heard and decided here in Minnesota, notwithstanding his transfer to another state. See McCoy v. United States Board of Parole, 537 F.2d 962, 966 (8th Cir. 1976) (as long as the district court retains jurisdiction over a habeas petitioner's custodian, the petitioner's post-filing transfer to another district does not divest the court of jurisdiction over the petitioner's claims).

Respondents' most recent submissions offer no specific date by which Petitioner's removal is expected to be completed. Based on these circumstances, Petitioner claims that he is entitled to a writ of habeas corpus that would cause him to be released from his ongoing post-removal-order detention.[2]

Petitioner claims that the INS will not be able to complete his removal in the reasonably foreseeable future, and that he must therefore be released from custody pursuant to the Supreme Court's decision in Zadvydas v. Davis, 533 U.S. 678 (2001). Respondents disagree. They contend that the INS is diligently attempting to carry out the removal order, and that it is only a matter of time before that effort succeeds. Respondents further contend that Petitioner himself is largely responsible for the slow pace of the removal process, because he has refused to cooperate with the INS, and he has provided misinformation about his birthplace. For the reasons discussed below, the Court agrees with Respondents.

---

[2] Several of the claims listed in the original petition, (Docket No. 1), appear to challenge the validity of the removal order itself. However, all of Petitioner's subsequent submissions clearly indicate that he is not presently challenging the removal order, but only his ongoing INS post-removal-order detention. (For example, in a memorandum dated May 28, 2002, [Docket No. 15], Petitioner states [at p. 3] that "he did not wish to further resist his removal because he does not want to remain in INS custody.") It is clear that if Petitioner ever intended to challenge the removal order itself, he abandoned that notion soon after his original petition was filed. Moreover, Petitioner could not challenge his removal order in the present habeas corpus proceeding in any event. The exclusive remedy for seeking judicial review of a removal order is a direct appeal to the Court of Appeals, (which Petitioner has not pursued). Velazquez v. Immigration and Naturalization Service, 876 F.Supp. 1071, 1075 (D.Minn. 1995) (Kyle, J.) ("Federal district courts do not have subject matter jurisdiction to review final deportation orders. Instead, the Courts of Appeals are vested with exclusive jurisdiction to review decisions made during a deportation hearing.") See also Bini v. Aljets, No. 01-3234 (8th Cir. 2002), 2002 WL 535083 (unpublished opinion) at *1 (district court lacked jurisdiction over alien's habeas challenge to his removal order, because Congress has given the federal appellate courts the exclusive authority to review such orders), citing Foti v. INS, 375 U.S. 217, 224 (1963).

## II. DISCUSSION

Both sides have correctly recognized that this case must be resolved by application of the Supreme Court's ruling in Zadvydas v. Davis. In that case, the Court reviewed the habeas corpus claims of two resident aliens who were being detained by the INS after being ordered out of the country because of their criminal convictions. The INS was unable to carry out the removal orders against the two aliens because no country would accept them. Acting pursuant to 8 U.S.C. § 1231(a)(6), the INS kept both of the aliens in extended post-removal-order confinement. Because there was no reason to believe that any country would accept them at any time in the foreseeable future, the two aliens found themselves facing indefinite INS detention, even though they had already fully served their prison sentences for their crimes.

In Zadvydas, the Supreme Court considered whether the INS could detain removable aliens indefinitely pursuant to § 1231(a)(6).[3] The Court found that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem." 533

---

[3] 8 U.S.C. § 1231(a)(6), the statute that authorizes the INS to detain removable criminal aliens pending the execution of removal orders, provides as follows:

> "An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)."

The "removal period" referred to in § 1231(a)(6) is a 90-day period following the entry of a removal order. 28 U.S.C. § 1231(a)(1). Paragraph (3) of § 1231(a), (referred to at the end of § 1231(a)(6)), directs the INS to impose certain terms and conditions of release for aliens who are subject to removal orders, but have not yet been removed by the end of the 90-day removal period.

U.S. at 690. However, § 1231(a)(6) was not held unconstitutional, because the Court determined that the statute, as construed to preserve its constitutionality, does not actually authorize indefinite INS detention. According to the majority opinion –

> "In our view, the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention."

Id. at 689.

The Court ultimately held in Zadvydas that a removable resident alien cannot be detained indefinitely, but he can be lawfully and constitutionally detained for "a period reasonably necessary to bring about that alien's removal from the United States." Id. The Court further held that six months is a presumptively reasonable time in which to complete an alien's removal. Id. at 701. "After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." Id.

In the instant case, Petitioner's removal order became final in May 2001, and the presumptively reasonable period for completing his removal (per Zadvydas) ended six months later in November 2001. Because the presumptively reasonable period for completing removal has expired (long ago), the Court must consider whether Petitioner has provided "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," and if so, whether Respondent has offered "evidence sufficient to rebut that showing." Id.

Although the Court is sympathetic to Petitioner's current predicament, he is not presently able to show that he is entitled to relief under Zadvydas. This conclusion is based on two primary considerations.

First, nothing in the record suggests that Petitioner will not ultimately be removed either to Ethiopia, or, perhaps, to Eritrea. The removal process obviously has been unfolding very slowly, and even now the end does seem to be approaching as quickly as both sides would like. However, this is not a case in which removal is, for all practical purposes, hopeless. In this critical respect, Petitioner's case is different from Zadvydas.

There was no reason to believe that the aliens in Zadvydas would ever be removed. One of them, Kestutis Zadvydas, had been born in a German refugee camp to non-German parents. Germany refused to take him back because he was not a German citizen, and no other country in the world would accept him. The second alien, Kim Ho Ma, came from Cambodia – a country that apparently refuses to accept any aliens who have been ordered out of the United States. Thus, it is clear that both of the aliens in Zadvydas were facing a truly indefinite, and possibly permanent, term of post-removal-order confinement.

Unlike the two aliens in Zadvydas, Petitioner cannot show that his removal is a hopeless cause. Respondents have shown that aliens have been successfully removed to Ethiopia during recent years. According to INS official Michael Rozos:

> "The Government of Ethiopia does issue travel documents for the purpose of removal of citizens of Ethiopia from the United States. [¶] Over the past five years, INS records indicate that 172 citizens of Ethiopia have been removed or deported from the United States."

(Declaration of Michael D. Rozos, Sr., dated February 28, 2002, [Docket No. 7], at ¶s 4-5.) Petitioner has offered nothing to refute Respondent's assertion.

Because there is no apparent "institutional barrier" preventing Petitioner's ultimate removal to his homeland, this case is significantly different from Zadvydas. Fahim v. Ashcroft, 227 F.Supp.2d 1359, 1365-66 (N.D.Ga. 2002) (upholding the lengthy post-removal-order detention of an Egyptian alien where there was "no reason to believe that he will not ultimately be returned to Egypt").

The court's opinion in Fahim includes several observations that are pertinent here, including the following:

> "[T]he reasonableness of detentions pending deportation cannot be divorced from the reality of the bureaucratic delays that almost always attend such removals. While the American government can be faulted if its bureaucracy causes delay, it cannot be held responsible for the inefficiencies, or worse, of the bureaucracies of other countries. Clearly, it is no secret that the bureaucracies of second and third world countries, and not a few first world countries, can be inexplicably slow and counter-intuitive in the methods they employ as they lumber along in their decision-making. To conclude that a deportable alien who hails from such a country must be released from detention, with the likely consequence of flight from American authorities back into the hinterlands, simply because his native country is moving slow, would mean that the United States would have effectively ceded its immigration policy to those other countries. The Court does not read the holding in Zadvydas as requiring such an extreme result."

227 F.Supp.2d at 1367. This Court agrees with the foregoing analysis, and finds it to be applicable here as well.

This Court also fully agrees with the reasoning and conclusion of Lema v. United States Immigration and Naturalization Service, 214 F.Supp.2d 1116 (W.D.Wash. 2002) -- a case that bears an uncanny resemblance to this one. Lema was a habeas corpus action brought by an alien from Ethiopia, who had been ordered out of the United States because of his criminal convictions. The INS tried to get travel documents that were needed for removal, but the Ethiopian government officials were very slow in responding to the INS's

requests for assistance. Moreover, in Lema, as in this case, the petitioner hindered the removal process by providing conflicting information about his birthplace. The removal process was delayed, because the petitioner had created confusion about whether he had been born in Ethiopia or Eritrea.

In Lema, the Court pointed out that

> "In some circumstance, the continuing failure of a destination country to respond to a request for travel documents may provide the Court with "good reason to believe" that deportation is not likely in the reasonably foreseeable future. For example, where the destination country's lack of response is combined with the INS' inability to explain the silence and the absence of any indication that the situation may change, continued detention is unreasonable and the alien should be released.... [Citation omitted.] In other instances, however, a country's failure timely to respond may reflect nothing more than bureaucratic inertia, suggesting that while the issuance of travel documents may be a slow process, there is no substantive difficulty and the deportation remains foreseeable. The record in the above-captioned matter supports the conclusion that the delay in issuing travel documents to petitioner arises from the fact that the Ethiopian Consulate is unsure of petitioner's nationality. Petitioner has not suggested any other cause of delay and has not provided any evidence of a more permanent obstruction to his deportation...."

Id. at 1118. What the court said in Lema is equally true here.

The second major factor that causes the Court to reject Petitioner's Zadvydas claim is his lack of cooperation in the removal process. Respondents point to two specific actions by Petitioner that have exacerbated the already difficult task of removing an alien to Ethiopia. First, Petitioner refused to fill out the travel document application form in May 2001, and second, he has provided conflicting information about his place of birth.

Federal law specifically requires removable aliens to cooperate in the removal process. 8 U.S.C. § 1231(a)(1)(C) extends the normal 90-day time limit for detaining criminal aliens facing removal "if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts

to prevent the alien's removal...." A related statute, 8 U.S.C. § 1253(a)(1), authorizes criminal prosecution of a removable alien who "willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the aliens departure" or "connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure...." Petitioner has not complied with these two statutes.

Respondents have persuasively argued that Petitioner's refusal to sign the travel document application form has delayed the completion of his removal, and Petitioner has not refuted that argument. Petitioner claims that he was confused about the purpose of the document application form that he was asked to complete, and it appears that he is now willing to properly complete the form. The fact remains, however, that Petitioner's initial refusal to complete the form has substantially impeded the removal process.

It is also readily apparent that Petitioner has hampered the removal process by making a host of inconsistent statements about his birthplace. The confusion regarding Petitioner's birthplace is <u>not</u> just the result of a misunderstanding that occurred many years ago when he first came to this country. As recently as last March, by which time Petitioner supposedly was trying to speed up his removal so he could end his INS detention, he expressly stated, in writing, that he "was born in Asmara City on 1/1/65." (Attachment to letter dated March 25, 2002; [Docket No. 12].) That statement, and other similar statements suggesting that Petitioner had been born in Asmara, caused the INS to temporarily discontinue its effort to remove him to Ethiopia, and begin a new effort to remove him to Eritrea. (Declaration of Bruce A. Norum, [Docket No. 20], ¶ 6.) The INS has undoubtedly wasted considerable time (and resources) during the removal process,

because of the misinformation that Petitioner has provided regarding his birthplace.

Here, as in Lema –

> "[I]t is likely that the delay in deportation will end as soon as the Ethiopian government's confusion over this [birthplace] issue is alleviated. In such circumstances, there is not 'good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future.'"

214 F.Supp.2d at 1118. Cf. Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37, 51 (D.D.C. 2002) (rejecting INS's "failure to cooperate" argument where there was no indication that the alien-petitioner had refused to request travel documents, or that he "gave false or misleading information that impeded the issuance of travel documents").

In Lema, the Court ultimately concluded that:

> "The INS and petitioner, working together, should be able to convince the government of Ethiopia that petitioner is, in fact, a native of that country. Petitioner has provided no reason to believe that, once Ethiopia's legitimate concerns are addressed, travel documents will not issue in the foreseeable future. Of course, overcoming the Ethiopian government's current misunderstanding (which has undoubtedly been memorialized in various reports and decision documents) may take some time and effort, but petitioner's deportation remains reasonably foreseeable even though it may not happen quickly. If petitioner chooses not to assist the INS in accomplishing his deportation, the process will likely take even longer. That does not mean, however, and petitioner has not shown, that the INS, acting alone through its normal channels, will be unable to correct the Ethiopian government's misapprehension regarding petitioner's nationality. Based on the existing record, the Court finds that petitioner has not met his burden of showing no significant likelihood of deportation in the reasonably foreseeable future."

Id. at 1118-19. This Court reaches the same conclusion here.

## III. CONCLUSION

In sum, Petitioner has failed to show that the INS will not be able to remove him to Ethiopia in the reasonably foreseeable future. Even though Petitioner has already been detained far longer than the presumptively reasonable six-month removal period discussed

in Zadvydas, Petitioner does not appear to be facing the prospect of indefinite detention. The delays that have occurred thus far in the removal process are attributable to bureaucratic ineffectiveness and Petitioner's own self-created impediments. It may take some time to overcome the problems that have hindered the removal process to this point. However, the Court is confident that if Petitioner has finally begun to earnestly and honestly cooperate with the INS, (as he claims he has), then he will be removed to Ethiopia in the reasonably foreseeable future. Thus, the Court concludes that Petitioner's current INS detention is legally and constitutionally permissible under Zadvydas. It will therefore be recommended that Petitioner's application for a writ of habeas corpus be denied at this time.

Finally, the Court points out that the phrase "at this time" has been deliberately added to the recommended disposition of this matter. Petitioner's lengthy post-removal-order detention to date is very disturbing. And the fact that the INS is still unable to provide an expected completion date for removal is even more disturbing. As the Supreme Court pointed out in Zadvydas, the longer it takes for the INS to remove an alien, the more untenable his ongoing detention becomes. 533 U.S. at 701 ("as the period of prior post-removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink"). If Petitioner hereafter cooperates with the INS, fully and consistently, and if he is able to demonstrate that the INS still cannot complete his removal even with such cooperation, he might yet be able to sustain a Zadvydas claim at some point in the future. The dismissal of the current petition should not prevent Petitioner from

seeking habeas relief again at some later date.[4] This final observation will hopefully provide some additional incentive to both Petitioner and the INS to diligently work together toward the speediest possible completion of Petitioner's removal.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Respondent's motion to dismiss, (Docket No. 5), be GRANTED;

2. Petitioner's application for a writ of habeas corpus, (Docket No. 1), be DENIED at this time; and

3. This action be DISMISSED.

Dated: January 29, 2003

ARTHUR J. BOYLAN
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before February 11, 2003.

[4] Any future habeas action that Petitioner may choose to bring should be filed in the district where he is then confined.